Good morning, Your Honors. James Kester for Armando Garcia Ayala. I did receive the message that the Court wanted to focus on the probable cause issue and the staleness issue, and I'll try and focus on that. Relative to the staleness issue, and the staleness issue and the probable cause issue are completely intertwined, and so you can't really, in this case, you can't separate one from the other. The staleness issue itself, obviously there's case law that under certain conditions, even though you can have, even though the ideal situation is that the search be, and the probable cause be coincidental and contemporaneous to the illegal activity, obviously in the Ninth Circuit there's case law that extends that in drug cases, and obviously this is a drug case. However, those cases that do extend the time period, up to and over 18 months, all involve cases where there's substantial evidence of some kind of ongoing criminal activity on behalf of either the personal subject of the search or the subject property of the search. And what distinguishes this case from those is that you do not have any of that. Obviously the affidavit relates period of a single drug transaction that occurred over a four-day period, 18 months before the search, and 15 months following the initial incident, and a 15-month period where there doesn't seem to be any follow-up investigation. So by the time the Deputy Chang swore out her affidavit and it was presented to the magistrate, what you had was this information of a single drug transaction. You kept saying transaction. Transaction was a little bit more than transaction. It was the procurement of the materials by which to cook the methamphetamine. It was the preparation and manufacture of the methamphetamine, and it was the establishment of a distribution for the methamphetamine. So it wasn't just selling a Ford. It was actually manufacturing the Ford. Your Honor is correct, but all of the evidence of the manufacturing and the preparation and distribution was centered around actually a three-day period where they had been monitoring phone calls. We don't know how long they had been monitoring Mr. Ayala's phone calls, but incident to that, they picked up some information that he was going to manufacture for and deliver some product to someone up north. Again, a three- or four-day period. After that arrest was made on the way up to San Leandro, there is no investigation until a period of time 15 months subsequent to that. We don't know whether Mr. Ayala, and neither would the magistrate, whether Mr. Ayala was now continuing to distribute and manufacture the methamphetamine or whether that was the end of his involvement. I mean, let's say it was. So what? Then what we have is now the investigation jumps ahead 15 months. We now are in the But he would still have committed a crime 15 months earlier. He definitely committed a crime 15 months earlier, and I'm not. The appellant doesn't contest the possibility that he committed a crime 15 months earlier because, again So they want to go in and find records of the crime that he committed 15 months earlier. But the problem becomes after this 15-month period of time, we now have an affidavit that says, okay, we're now investigating this particular subject location. However, when the magistrate is issuing a search warrant to a subject location, there has to be some kind of substantial nexus between that location and illegal activity. I think that the Ninth Circuit I thought there was evidence suggesting that drug dealers do stuff in their homes connected to their crimes. They might keep records there. Now, I would respectfully disagree with the court's characterization of this being his residence because there is not substantial evidence that this was now his residence. The investigation, which all we have in the affidavit, is three surveillances of which there's no record of Mr. Ayala receiving in the affidavit any mail at the location. There's records that the location, the utility subscriber is the same person for the last four years. There's no description who that person is, certainly not described as Mr. Ayala. There's no facts in the affidavit that the investigators saw Mr. Ayala stay overnight at the location. Kennedy, wasn't the person to whom the utilities were charged also the owner of an automobile that Mr. Ayala used from time to time? Well, the affidavit said he uses this from time to time. It doesn't give you – it doesn't give us any idea of how often he used it. And even so, that still – So he has to have some relationship with the owner of the car who happens to be the person who lives there. Well, that would be a reasonable assumption, but it still doesn't establish this location as being Mr. Ayala's residence. Obviously, oftentimes people use their friend's cars without being cohabitants. And so without any deeper facts relative to Mr. Ayala's connection with the subject property, I think it was a stretch for the Magistrate to assume and certainly a overstatement for the deputy – or Agent Chang to say that this was Mr. Ayala's residence at the time. Under – and when you don't have that substantial nexus between residents particularly, then I think the law in the circuit is that there's a great, great deference that needs to be afforded residence, even such that merely because a suspected criminal has gone to this personal residence, that that's not sufficient to find probable cause to violate the sanctity of that residence vis-à-vis the third person. But he didn't more than go there. He actually committed criminal acts there. No. The Court is wrong on that. The criminal acts were committed and the officer, Deputy Chang, left this out, but the criminal acts that were committed in 18 months prior were committed at a residence in Pomona. That residence somehow is left out of the affidavit. And I addressed that a little bit in the brief, that the – somehow or other, Officer Deputy Chang or Agent Chang doesn't include the fact that this ongoing investigation 18 months earlier involved a residence in Pomona, and that became very clear in the trial testimony. You want to address why United States v. Leon may not apply? Good faith exception? And that dovetails into the question about whether or not there were material misrepresentations or omissions in the affidavit of probable cause. And we were touching on that a little bit. And if so, then wouldn't the good faith exception apply? Your Justice is correct that there is no bright line rule, and that will be a factual question in this case that this panel will have to resolve for itself. But relative to the Leon exception, that the Leon – one of the exceptions to the Leon exception is that if the officer who swore out the affidavit of probable cause made material omissions or misrepresentations in the affidavit. And because of the testimony that was elicited at trial, it became clear that Agent Chang failed to alert the Court that the original investigation involved a house in Pomona, not the subject property. She also testified to it seems to have made more observations or had a surveillance going on of the subject property more than she related in the affidavit. And so particularly if the officers were surveilling what became the subject property over this three-month period of time, and they were spending considerably more time than the two or three times that were referred to in Agent Chang's affidavit, and nothing was going on, there didn't seem to be any indication of strange people coming to the subject property at any time. There didn't seem to be any evidence of product or something like that being delivered to the subject property. There didn't seem to be, again, there didn't seem to be, there was no evidence of Mr. Ayala staying over the subject property, receiving any mail at the subject property. And those questions are left open by the record, but certainly at, excuse me. Kennedy. I have a question. My note indicates that the defendant waived any contention that the affidavit from Agent Chang contained material omissions by failing to raise the issue before, during, or after trial. Again, I would say that that's respectfully say that that's not correct, that during the suppression motion hearing at the district court level, attorney for appellant raised, definitely raised a Franks issue. He said to the court, listen, and it was in his written opposition, or his written response to the people's opposition to the motion to suppress, that it seems to me that there's a lot of stuff, and this is what he said, there's a lot of stuff that's missing from the record from what Officer Chang was doing or the DEA was doing. There's a 15-month period of time where we don't know anything, and I'd like to have an evidentiary hearing and call in officers to testify, to which the district court said, I don't think we need that. You're just fishing. And so I respect that. But he didn't raise the issue that the original investigation was at Pomona rather than the subject site. He didn't raise the issue that there was more surveillance of the subject property and that Detective Chang didn't mention that. Those two concrete issues, which you raise now, were not raised concretely at the district court level, correct? Correct. And I would respectfully suggest that the reason that wasn't raised is because when he asked for a chance to bring the DEA agents into court and have them testify to what the investigation was, the district court said no, that you're just, you know, you're just fishing. But he didn't mention those two issues as a reason to bring the DEA officer in to be examined. Well, probably with the Pomona. He said there's a lot missing. He didn't say what was missing. That's correct. That probably would have been supplemented had the district court actually engaged in a Franks hearing. Now, I actually see that my time is up. If there's any other questions? I would just like to ask one. Is it your view that an officer who both swears to an affidavit and executes a warrant lacking probable cause can never have acted in good faith? No. That's not my point. And what the court has to do, though, is look at the totality of the circumstances under which the affidavit officer has done in order to gather that good faith. And there's a lot of case law that talked about the good faith. And I think in Leon and Long, I think that the officers went to a U.S. attorney and said, listen, here's my affidavit. Do I need to add anything? Do I need to do this? Do I need to do that? And so they got input from somebody other than just law enforcement. In this case, there's no question or evidence that the, again, Agent Chang tried to get any input from the U.S. attorney's office or anything like that. And I understand your position. Thank you. Thank you. Good morning. May it please the Court. Kevin Rosenberg on behalf of the United States. What's important for the Court to focus in on in this case is that the defendant's conduct here did not involve a single isolated criminal act. This is not a case as if the defendant was standing on some street corner and sold somebody a small amount of drugs. What we had here was we had an investigation that involved a wiretap of the defendant's phone that started on approximately May 20th, 2004. So by necessity, the people that obtained the wiretap over the defendant's phone had to have made a substantial showing that the defendant was involved in some sort of criminal activity, that the defendant was in contact with other individuals using his telephone. Those are the things that a magistrate and certainly this Court would know from its experience would be required to obtain a wiretap. What did the offices do to update the information acquired in 2004? Well, they didn't do anything to update the information as to whether the defendant was still engaging in criminal activity. But they went to his suspected residence and conducted surveillance approximately four different times. They saw the defendant there two different times. And each of those times he was getting into a different vehicle parked at a different place. One time the vehicle was parked, I believe, on the driveway or right at the premises. The other time it was around the corner. All right. You said respective residences. Are you suggesting that the defendant had more than one residence? No, I'm not. I didn't mean to suggest that. It's possible. But at the time the agents were swearing out the search warrant, they didn't articulate that he had possibly other residences. It's clear, though, from the trial testimony that he was living somewhere else at the time of the wiretap. There was a Pomona address that he appeared to be living at at that time, and there was testimony about that address from Special Agent Merchant. But I'm not saying that he may have had that address still at the time they executed the warrant. But during this wiretap investigation ---- Did the warrant application identify this as the defendant's residence? It did. It did, Your Honor. Special Agent Chang stated that she believed that it was his residence based upon DMV information and surveillance. She described the surveillances that were conducted. She described the fact that the defendant was seen there twice, two different occasions. I believe about six weeks apart or four weeks apart. She described the fact that the defendant was seen driving a vehicle that was registered to the person who was the utility subscriber there. So she did establish and set forth facts that supported her belief that the defendant resided at that location. Now, again, the criminal activity the defendant was involved with involved multiple customers. It involved customers in Northern California, customers apparently in Southern California. The wiretap revealed that the defendant had a courier that was driving his drugs from Southern California to Northern California. It revealed that he appeared to direct other people in the manufacturing of methamphetamine. This was a large quantity of methamphetamine, not only that was seized, which was approximately four pounds, but the calls detailed in Special Agent Chang's affidavit support her belief that the defendant had manufactured as much as 15 pounds. So by the time he distributed the four pounds, he would have had 11 pounds remaining. So this was an ongoing criminal enterprise. And the complaint that was also a part of this affidavit, the Special Agent Chang requested an arrest warrant for the defendant. It alleged that he had committed a conspiracy to distribute methamphetamine, not just one transaction, but clearly it made it clear that the government was trying to arrest him for a conspiracy. At some point, information like that does become stale, and we don't know. There's an 18-month gap in the investigation. He would have had plenty of time to get rid of the 10 pounds or 11 pounds. What is there to suggest that there's a continuing nexus to this? And that there would be evidence of criminal activity there? The important thing to realize there, Your Honor, is that what the government was looking for was documentary evidence of the defendant's crime. They weren't looking for the drugs. They were looking for the documents. Correct, Your Honor. That's absolutely right. And I think had the government been looking for drugs, I don't think we would have probable cause to be looking for drugs at that time because we did not have evidence that he was, at that time, still engaged in drug trafficking. But what the agents were looking for was past evidence of his past criminal activity, ledgers, notes, payo sheets, phone records, indicia. And what's the chain of inference that suggests that they would be found at this location? It's more than just a chain of inferences, Your Honor. It was based on special agent trains. It was certainly not recipient evidence. There wasn't anybody who said, hey, I wasn't there and saw records of drug transactions, right? Well, that's true. What I mean is it has to be some sort of chain of inference based on some fact in the real world that leads to the conclusion, yes, there probably are records there. So why don't you explain to me what the chain of inference is? I see. Yes, Your Honor. Well, Special Agent Chang set forth her training and experience that drug traffickers maintain records, and they maintain records because they need to know who has paid them, who owes them money, who they've sold drugs to, who their contacts are. She explained that in her affidavit. And therefore, because the defendant was engaged in an ongoing criminal enterprise, which Special Agent Chang believed reflected his higher status. Well, what evidence is it that that enterprise continued for 18 months? I mean, he could have been involved in it. And then he had this guy got arrested. He could have gotten scared and said, look, I've had enough. I'm going to get out of the business. And at some point evidence like that, you can't presume that somebody is going to keep engaging in a criminal enterprise, right? That's true. Twenty years down the road, you couldn't say, well, he had evidence 20 years earlier that he was a drug dealer, and therefore he must infer that he's been a drug dealer all this time, and therefore he must have records in his home. That's true. Special Agent Chang described in her training experience and related that she was personally aware of or had heard of cases where drug traffickers did maintain records for years. And here, clearly, we're not talking about 20 years. That would be a much different situation. We're talking about approximately 18 months. And the question is, under the case law, was it reasonable to seek the evidence in that location? Defense counsel talks about the test being whether there's a substantial nexus to the location. And the government believes the test is a reasonable nexus, not a substantial nexus. There doesn't have to be direct evidence that the evidence to be sought is actually there. But even if there wasn't a probable cause here, certainly the agents acted in good faith in this particular case. They set forth specific facts regarding the defendant's prior criminal activities. They articulated how and why they believed the documentary evidence they were seeking sometime later was likely to be present at the defendant's suspected residence. And since defense counsel brought this point up, this affidavit was actually reviewed by a prosecutor, and that's me. My initials are on the search warrant, the face page of the search warrant. I reviewed it. We didn't brief this issue, but I'm bringing this up in response to what defense counsel said. So the question on the good faith issue is whether a reasonably well-trained officer would have known that the search was illegal despite the issuance of the warrant. And the point that Your Honor made and that the district court observed is that there is no bright-line test as to scaleness. There are varying cases, some of a few months where it's a sufficient nexus and some as long as two and a half years or more. So to expect the agents to know that would be unfair, and it wouldn't serve the purposes, the deterrent purposes of the good faith exception, to not apply that in this case. The court did correctly note that the defense counsel at trial at no point, when he may have even heard this evidence at trial about some supposed omissions, he didn't bring that up. So he had the opportunity to raise that issue with the district court, that there may be facts he couldn't have known. He didn't do that. And it's not as if Special Agent Chang was hiding the ball here. In her affidavit on an excerpt of Record 108, she specifically told the magistrate that she wasn't putting everything she knew about the investigation or the case into the affidavit. Kennedy. What is the scope of our review where there wasn't an objection made in the trial court? Was it abuse of discretion? Or do we see do we look at a de novo? Well, I don't think the good faith exception. The good faith exception is reviewed de novo. The application is reviewed de novo, Your Honor. So it's not as if Special Agent Chang was hiding the ball here. She specifically told the magistrate that there were other facts she was leaving out. And the facts that she was or were leaving out about her other surveillance has actually hurt the defendant. At trial, she testified that she had seen him there other times. So it didn't even help the defendant's cause in trying to suggest that it would have undermined probable cause. So here are some of those reasons the government believes that you should find that there was probable cause to issue the search warrant or alternatively apply the good faith exception. Thank you. Thank you, Your Honor. We're out of time. Would you like a minute for rebuttal? I would like to take a minute to take questions. Thank you. We'll take a ten-minute recess before the next case. All rise.
judges: Kozinski, Nelson, Bea